IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

CARL FERNLUND, NANCY FERNLUND,
SAMANTHA FERNLUND, and
JASON DUBY, all individuals,

Case No. 1:13-cv-01495-CL

Plaintiffs,

REPORT & RECOMMENDATION

v.

TRANSCANADA USA SERVICES INC d/b/a
TRANSCANADA, a Delaware company; GAS
TRANSMISSION NORTHWEST, LLC, a
Delaware Limited Liability Company; AVISTA
CORPORATION d/b/a AVISTA UTILITIES, a
Washington Corporation; and NORTHWEST
PIPELINE LLC, formerly NORTHWEST
PIPELINE GP, a Delaware Limited Liability
Company.

Defendants.

CLARKE, Magistrate Judge.

Plaintiffs Carl Fernlund ("Mr. Fernlund"), Nancy Fernlund ("Mrs. Fernlund"), Samantha

Fernlund and Jason Duby (collectively, "Plaintiffs") assert claims of negligence, negligence per

se, strict liability, trespass, nuisance, and conversion against Defendants Transcanada USA

Services, Inc., d.b.a. Transcanada ("Transcanada"); Gas Transmission Northwest, L.L.C.

("GTN"); Avista Corporation, d.b.a. Avista Utilities ("Avista"); and Northwest Pipeline L.L.C., formerly Northwest Pipeline GP ("Northwest") (collectively, "Defendants").

Currently before the court are Defendants' three motions for summary judgment. Transcanada and GTN move for summary judgment (#64) on all of Plaintiffs' claims. Avista and Northwest join in the motion (#72, #77). In addition, Avista and Northwest independently move for summary judgment as to all of Plaintiffs' claims (#77 and #91, respectively). In response to Defendants' motions, Plaintiffs ask the court to take judicial notice (#79) of certain proffered documents. For the reasons set forth below, Plaintiff's request for judicial notice (#79) should be DENIED and Defendants' motions (#64, #77, #91) should be GRANTED.

## PRELIMINARY PROCEDURAL MATTERS

### I.    Admissibility of Declarations

Both parties object to the admissibility of declarations submitted by the opposing side. A trial court can only consider admissible evidence in ruling on a motion for summary judgment. Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). For summary judgment purposes, a declaration is admissible if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the . . . declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). An expert opinion need not be made on personal knowledge if it is based on the facts of the case. See Cabrales v. Cnty. of Los Angeles, 864 F.2d 1454, 1460 (9th Cir. 1988), cert. granted, judgment vacated, 490 U.S. 1987 (1989), opinion reinstated, 886 F.2d 235 (9th Cir. 1989).

### A. Toews Declaration

Transcanada and GTN submit the declaration of Edward Toews (#67) in support of their motion for summary judgment. Toews has over 20 years of experience in gas transportation,

personal knowledge of the at-issue facility, and a higher education in engineering. Toews Decl. ¶¶ 2, 4, 5, 6. Under Federal Rules of Evidence 701 and 702, he is competent to offer opinion testimony regarding the normal operations of the natural gas facility. Accordingly, the Court should consider Toews' declaration in ruling on Defendants' motions.

## B. Robinson Declaration

Defendants challenge the admissibility of the expert declaration of David Robinson (#98-13). In the seminal case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert I"), the U.S. Supreme Court charged trial judges as "gatekeeper[s] in determining whether to admit or exclude expert evidence" in accordance with Rule 702. See Dukes v. Wal–Mart, Inc., 509 F.3d 1168, 1179 (9th Cir. 2007) (internal quotation marks omitted). To fulfil this essential role, this Court must ensure Robinson's conclusions meet the "trilogy of restrictions on expert testimony: qualification, reliability and fit." McClellan v. I-Flow Corp., 710 F.Supp.2d 1092, 1099 (D. Or. 2010) (quoting In re Human Tissue Prods. Liab. Litig., 582 F.Supp.2d 644, 655 (D.N.J. 2008)).

As a threshold matter, Rule 702 requires the Court to determine whether Robinson is "qualified as an expert by knowledge, skill, experience, training, or education[.]" FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II") (whether proffered expert testimony is admissible "only arises if it is first established that the individual[ ] whose testimony is being proffered [is][an] expert[ ] in a particular . . . field"). Robinson is an engineer with relevant prior experience overseeing the construction and placement of natural gas pipelines, airfield fueling systems, hot pit refueling systems, and fixed hydrant systems. Robinson Decl. ¶¶ 1, 2. While his resume is impressive, it does not indicate any familiarity with the subject of his proffered expert opinion: natural gas odorization. Given this

apparent discord, the Court cannot confidently conclude Robinson is qualified to give expert testimony on the subject matter addressed in his declaration. See Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co., 752 F.3d 807, 817 (9th Cir. 2014) (expert did not have the knowledge or experience required under Rule 702 to permit him to give expert testimony because his testimony included standards outside of his field of expertise).

Even if Robinson was qualified under Rule 702, his declaration still must be excluded because it fails to satisfy the remaining expert testimony requirements. To assess the second requirement, reliability, the Court must ask "whether the reasoning or methodology underlying the testimony is scientifically valid." Daubert I, 509 U.S. at 592-93. Reliable testimony must be grounded "in the methods and procedures of science," and signify knowledge beyond "subjective belief or unsupported speculation." Daubert I, 509 U.S. at 590. Daubert I identifies four factors that the Court may consider in assessing reliability, including (1) whether a theory or technique can be and has been tested; (2) whether a theory has been subjected to peer review and publication; (3) whether a "particular scientific technique" has a known or potential rate of error; (4) and whether the theory or technique enjoys general acceptance within the "relevant scientific community." Daubert I, 509 U.S. at 593–94. These factors "do not constitute a 'definitive checklist or test'" and "may or may not be pertinent" depending on the nature of the issue, the expert's area of expertise, and the subject matter of the testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert I, 509 U.S. at 593).

Robinson bases his opinion that the gas facility's odorization system is operating abnormally and out-of-compliance with federal law on "testimony in this case" read in conjunction with some unnamed equipment guides and a "professional engineering manual." Robinson Decl. ¶¶ 4, 7. Robinson does not provide adequate foundational information to

demonstrate why the guides and manual form a sufficient basis for his opinions. See Plush
Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc., 371 F. App'x 719, 720 (9th Cir. 2010)
(district court did not abuse its discretion in striking large portions of declarations where the
declarants did not provide adequate foundations regarding the declarants' knowledge base). It is
not clear whether the referenced equipment guides discuss the specific models at-issue. As such,
it is not clear whether Defendants have any reason to apply the guides' standards to their
operations. Nor is it clear whether the cited manual sets forth standards generally accepted in the
gas odorization field. This omission is made all the more concerning by Defendants' submission
of evidence that the so-called "professional engineering manual" is actually an uncited, undated
PowerPoint slideshow presentation. Robinson's references to the "manual" line up with this
high-level slideshow's bulletpoints. Ramfjord Decl. Ex. 9. Robinson provides no information to
suggest that the concepts or standards presented in the guides and "manual" can be or have been
tested, have been subject to peer review, have any known error rate, are generally accepted by
the gas transmission industry, or are applicable to Defendants' facility. See Daubert I, 509 U.S.
at 593-94. Nor can the Court identify any other factors beyond those listed in Daubert I that
operate in favor of admissibility. See Kumho, 526 U.S. at 158 (court acted within its lawful
discretion when it concluded expert did not satisfy the Daubert I factors or any other set of
reasonable reliability criteria). There is simply no evidence that Robinson's sources form a
reliable basis for his opinions.

Beyond its lacking foundation, the declaration's reliability suffers from two other fatal
flaws. First, it contains "unsupported speculation." See Plush Lounge, 371 F. App'x at 720
(district court did not abuse its discretion in striking portions of declarations that presented legal
conclusions without underlying support). Robinson advances legal conclusions without adequate

support. For instance, he opines that the frequency of odor releases constitutes a "nuisance" without indicating why he finds this to be true. Robinson Decl. ¶ 4. Second, Robinson does not address evidence on the record that directly conflicts with his opinion testimony. See City of Pomona v. SQM North America Corp., 750 F.3d 1036, 1049 (9th Cir. 2014) (an expert must "justify a foundational assumption or refute contrary evidence"). Robinson concludes that one of the facility's odorizers is operating in an abnormal manner despite ample evidence (including Plaintiffs' concessions) to the contrary. Robinson Decl. ¶ 7. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Kumho, 526 U.S. at 15 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Here, there is "simply too great an analytical gap" between the record and Robinson's conclusion to validate its reliability. Joiner, 522 U.S. at 146.

Portions of Robinson's declaration also fail to meet the final requirement of expert testimony: relevance. To be admissible, proffered expert testimony must assist the average trier of fact. FED. R. EVID. 702. The Supreme Court characterizes this prong as "the 'fit' between the testimony and an issue in the case." Daubert II, 43 F.3d at 1320 (citing Daubert I, 509 U.S. at 591). Testimony "fits" a case if it "logically advances a material aspect of the proposing party's case." Id. at 1315. Robinson's declaration contains opinions that offer no insight into the issues of the case. Robinson concludes that Defendants are not in compliance with federal law because they do not odorize their gas to the point of being "readily detectable." Robinson Decl. ¶ 4. However, Plaintiffs assert just the opposite — that odorant emissions are at nuisance levels. Relatedly, Robinson opines that Defendants are not sufficiently sampling odorant levels in their pipelines. Robinson Decl. ¶ 6. However, the concentration of odorant in pipelines is not at issue. Thus, some of Robinson's opinions confuse, rather than clarify, Plaintiffs' allegations.

In conclusion, Robinson's declaration does not demonstrate that he is qualified to testify as an expert on natural gas odorization. Nor has he shown that the sources of information underlying his testimony are reliable or valid. His declaration contains unsupported speculation and opinions that cut against the weight of the record without making any effort to recognize or refute contrary evidence. In addition, he offers opinions on subjects irrelevant to this case. For all these reasons, Robinson's declaration is not admissible and should not be considered in ruling on Defendants' motions for summary judgment.

Furthermore, Defendants have alerted the Court to the fact that Robinson is Plaintiffs counsel's spouse. Defendants voice concerns that Robinson is improperly biased in the outcome of this proceeding because his wife will earn a contingency fee if Plaintiffs succeed on their claims. Oregon Rule of Professional Conduct 3.4(b) prohibits an attorney from paying, offering to pay, or acquiescing in payment of an expert witness on a contingency fee basis. Plaintiffs' submission of Robinson's declaration does not directly violate the letter of this Rule. There is no evidence that Robinson's compensation is contingent on the outcome of this case. However, the submission does bump up against the Rule's underlying purpose of preventing the potential for biased expert testimony. Accordingly, the Court views the integrity of the declaration with some suspicion.

## II.    Plaintiffs' Request for Judicial Notice

Plaintiffs invoke Federal Rule of Evidence 201(b)(2) and ask this Court to take judicial notice (#79) of (1) an excerpt of the Klamath County Code, (2) a Klamath County "EFU Zone Lot of Record Dwelling Application," (3) Oregon's Statewide Planning Goals and Guidelines regarding agricultural lands, (4) Klamath County's goals for agricultural lands, and (5) a Google satellite image of 21821 North Poe Valley Road. Under Federal Rule of Evidence 201(b)(2), the

Court "may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice is proper only when the matter is "beyond reasonable controversy." Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1151 (9th Cir. 2005) (quoting FED. R. EVID. 201 advisory committee note). None of the proffered documents are dated. Plaintiff's accompanying declaration does not specify when these documents were published, otherwise made effective, or accessed by Plaintiffs. Accordingly, the scope and accuracy of these documents is not readily verifiable. Judicial notice should be denied.

Even if the court were to grant Plaintiffs' request as to the proffered State and County documents, it could only take judicial notice of the document's existence, not the truth of the facts contained therein. Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001) (public records are appropriate subjects for judicial notice, not for the truth of the facts recited therein but for the records' existence). Since Plaintiffs could have simply attached these documents to their moving papers in order to alert the court to their existence, Plaintiffs' request for judicial notice is superfluous. See Rezentes v. Sears, Roebuck & Co., 729 F.Supp.2d 1197, 1206 (D. Haw. 2010) (court finds a party's request for judicial notice "puzzling" since there is no reason to take notice of the existence of documents the party could have just included in its moving papers).

## FACTUAL BACKGROUND

### I.    The Gas Transmission Plant

The Klamath Falls Meter Station, which measures gas delivered to the Klamath Falls Lateral pipeline (KFL), and Compressor Station 14, which compresses gas down for transport along pipelines, have resided in the same location in Bonanza, Oregon for over thirty years.

Toews Decl. ¶¶ 7- 8. There are two odorizers at the site. The Medford Odorizer, which odorizes natural gas delivered to the Medford Lateral pipeline, was installed in 1995 and has been operational for 19 years. Toews Decl. ¶ 9. The Klamath Odorizer, which odorizes gas in the KFL, was installed in early 2009. Toews Decl. ¶ 10.

Multiple parties have stakes in the Bonanza facility. GTN, a subsidiary of TransCanada, owns, operates, and maintains Compressor Station 14 and the Medford Lateral pipeline. Toews Decl. ¶¶ 7, 9; Faulkenberry Decl. ¶ 5. GTN also operates and maintains both the Medford Odorizer and the Klamath Odorizer for the benefit of Avista, an intra-state gas distributor who is required by federal law to add odorant to natural gas before distribution. Toews Decl. ¶¶ 9-10, 13; Faulkenberry Decl. ¶ 6.

Northwest and its predecessors-in-interest owned and operated the KFL from 1962 until late December 2012, when Northwest sold the KFL to its current owner, Avista. Faulkenberry Decl. ¶ 4; Toews Decl. ¶ 8; Andersen Decl. ¶ 3. Prior to purchase, Avista inspected the pipeline, including its valves, and noted no concerns with its condition or Northwest's maintenance. Lisagor Reply Decl. Ex. 1, at 2 (Webb Dep. 10:13-19); Lisagor Reply Decl. Ex. 2, at 7 (Scott Dep. 85:3-10).

Before Avista acquired the KFL, Northwest permitted Avista to begin introducing odorized gas into it. Lisagor Decl. Ex. 2. With this permission, Avista installed the Klamath Odorizer on GTN property. Lisagor Reply Decl. Ex. 1, at 5 (Webb Dep. 13:14-15). Northwest played no role in selecting the odorizer, supervising the installation, or supporting the installation. Lisagor Reply Decl. Ex. 1, at 4 (Webb Dep. 12:6-18). Its only involvement was to allow the gas travelling through its pipeline to transition "from unodorized to odorized." Lisagor Reply Decl. Ex. 1, at 6 (Webb Dep. 14:1-10).

## II.    The Fernlund Residence

The parcel of land across the street from the gas facility was designated unsuitable for residential purposes due to nearby non-residential operations. Ellison Decl. Ex. D, at 4. In 1993, Plaintiffs applied for and received a Conditional Use Permit to build a home on the neighboring property despite its designation. Ellison Decl. Ex. A. In consideration of the permit, Plaintiffs signed a Restrictive Covenant precluding them from "filing complaints concerning accepted resource management practices that may occur on nearby lands including the normal useage [sic] of Pacific Gas Transmission Co." Ellison Decl. Ex. B.

Plaintiffs built a home on the 15.85 acre parcel directly across the road from the gas plant. Ellison Decl. Ex. C. They moved into the home in July 1996. Ellison Decl. Ex. E, at 2-3.

## III.    Odor Problems

Odorant, by design, is easily detected by the human nose. Ellison Reply Decl. Ex. G., at 10 (McNulty Dep. 37:9-11). Its "rotten egg smell" serves an important public safety function, warning consumers when otherwise odorless gas is in the air. Faulkenberry Decl. ¶ 7; Ellison Reply Decl. Ex. C, at 9 (O'Donnell Dep. 40:3-41:11). It is normal for a gas transmission plant, like Defendants', to periodically emit odor. Supplemental Ellison Decl. Ex. C, at 14-15 (N. Fernlund Dep. 99:20-100:5). Odors may emit when an odorizer is being replaced or repaired, an odorant tank is being filled, a valve manually or automatically vents, odorant molecules escape through equipment fittings, odorant leaks, or odorized gas leaks. Webb Decl. Ex. H, at 13 (O'Neill Dep. 75:11-22); Webb Decl. Ex. J, at 10 (Webb Dep. 32:21-23); Ellison Reply Decl. Ex. C, at 9 (O'Donnell Dep. 40:3-41:11); Ellison Reply Decl. Ex. G, at 10 (McNulty Dep. 37:4-8).

Weather conditions can cause odor to linger. Odorant does not evaporate as quickly in cold weather. Ellison Reply Decl. Ex. C, at 10 (O'Donnell Dep. 41:12-20). Climatic inversions can push the odor down close to the ground. Inversions occur "maybe four or five times a year" in the low spot of the valley where Plaintiff's home is located. Supplemental Ellison Decl. Ex. C, at 13, 19 (N. Fernlund Dep. 71:13-24, 118:2-13).

Plaintiffs first complained of the neighboring gas facility's odor in 2009, when the Klamath Odorizer was installed. Webb Decl. Ex. K, at 11 (Daniels Dep. 55:18-20). In February, GTN received reports of the smell of odorant emanating from the plant. Webb Decl. Ex. C, at 10. GTN dispatched a worker to investigate who identified the source of the problem as a weeping relief valve and a bad seal on the Klamath Odorizer. Webb Decl. Ex. C., at 16. Avista replaced the faulty odorizer. Webb Decl. Ex. C, at 22. GTN paid Plaintiffs $5,598 in full satisfaction of damages resulting from the leak. Supplemental Ellison Decl. Ex. A, at 4. In consideration of the payment, Mrs. Fernlund signed a receipt releasing "all claims of any kind or nature . . . against GTN or any person" arising out of the leak. Supplemental Ellison Decl. Ex. A, at 4. Mr. Fernlund approved of his wife's signature. Supplemental Ellison Decl. Ex. C, at 8 (N. Fernlund Dep. 58:11-60:20). Today, Plaintiffs have "no complaints at all" regarding this event. Supplemental Ellison Decl. Ex. B, at 6 (C. Fernlund Dep. 85:15-18).

Around the same time, some facility workers voiced concern that the Klamath Odorizer had been placed too close to the street and, thus, too close to Plaintiffs' home. Supplemental Ellison Decl. Ex. B, at 10 (C. Fernlund Dep. 89:7-25); Webb Decl. Ex. H, at 7-8 (O'Neill Dep. 17:19-18:15); Webb Decl. Ex. G, at 6 (McNulty Dep. 31:1-23). The proximity was concerning in terms of sight and smell, not health and safety. Ellison Reply Decl. Ex. G, at 7 (McNulty Dep. 31:1-17); Ramfjord Decl. Ex. 6, at 2 (Scott Dep. 79:4-10). GTN and Avista considered moving

the odorizer to appease Plaintiffs but ultimately decided it would be too burdensome to do so. Webb Decl. Ex. G, at 4, 6 (O'Donnell Dep. 23:9-21, 90:11-19).

Plaintiffs complained of the facility's odor "probably four to five times" per year in 2011 and 2012. Supplemental Ellison Decl. Ex. C, at 20 (N. Fernlund Dep. 124:1-14). Each time, Transcanada/GTN dispatched workers to address Plaintiffs' concerns. Supplemental Ellison Decl. Ex. C, at 20 (N. Fernlund Dep. 124:6-11). The workers would investigate and inform Plaintiffs whether any leaks were found or repairs were made. Supplemental Ellison Decl. Ex. B, at 13-14 (C. Fernlund Dep. 96:12-97:10).

In December 2012, Plaintiffs began making repeat complaints about a smell emanating from the facility. Ellison Decl. Ex. E at 3; Lisagor Decl. Ex. 4, at 3, 17 (N. Fernlund Decl. 50:5-17, 164:18-25). Defendants sent workers to investigate every complaint and "and time after time, [they] could find no problems." Ellison Reply Decl. Ex. C, at 13-14 (O'Donnell Dep. 58:18-59:13). Often, the dispatched workers did not smell any odor at all. Ellison Reply Decl. Ex. C, at 15 (O'Donnell Dep. 60:14-20); N. Fernlund Dep. 116:1-17.

However, on two occasions, Defendants did identify leaks associated with Plaintiffs' complaints. First, on Februrary 8, 2013, GTN identified and repaired a faulty valve on the Medford Odorizer that had caused 6 cups of Mercaptain (odorant) to leak. Webb Decl. Ex. A, at 10-11; Webb Decl. Ex. C, at 4-7. Then, in March 2013, in response to Plaintiffs' complaints, Transcanada identified a Class 2 leak in the KFL and alerted Avista, the line owner. N. Fernlund Dep. 116:9-117:1. Class 2 leaks are minor — Avista's internal procedures aim to repair them within six months. Ramfjord Decl. Ex. 4, at 4-5 (Daniels Dep. 84:24-85:2). Workers came to address the problem and fixed the leak within a matter of days. Lisagor Decl. Ex. 4, at 12 (N. Fernlund Dep. 159:8-25, 160:1-15).

Page 12 – Report and Recommendation

According to Plaintiffs, after the pipeline repair, the smell temporarily improved but then began to return "[n]ot every day, but many days, many mornings, many nights" up until February 2014. Lisagor Decl. Ex. 4B, at 4 (N. Fernlund Dep. 176:7-18). Plaintiffs have not detected an offensive odor since approximately February 2014. Lisagor Decl. Ex. 3, at 17 (C. Fernlund Dep. 169:14-24); Lisagor Decl. Ex. 4, at 5 (N. Fernlund Dep. 125:15-17).

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party fulfills its burden, the burden shifts to the non-moving party who must go beyond the pleadings to identify genuine issues of fact. Celotex Corp., 477 U.S. at 324. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by FED. R. CIV. P. 56, designate specific facts that show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076.

The court must view the evidence in the light most favorable to the nonmoving party. Szajer v. City of Los Angeles, 632 F.3d 607, 610 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine dispute of material fact should be resolved against the moving party.

Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. Sankovich v. Life Ins. Co. of North America, 638 F.2d 136, 140 (9th Cir. 1981). However, facts must be "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

This case arises from Plaintiffs' complaints of a "rotten egg" odor emitted from a natural gas facility neighboring their home. Defendants move for summary judgment, asserting Plaintiff's claims are barred by the Restrictive Covenant they signed in order to secure a Conditional Use Permit to build their home directly across the street from the gas facility. In pertinent part, the Covenant prohibits "the permit grantee and successors in interest from filing complaints concerning accepted resource management practices that may occur on nearby lands including the normal usage of Pacific Gas Transmission Co." Ellison Decl. Ex. B. Plaintiffs argue their current claims do not fall within the Covenant's purview.

The parties' dispute over the applicability of the Restrictive Covenant — and thus the viability of Plaintiffs' claims — can be broken down into three questions, First, can a party who is not specifically named in the Restrictive Covenant claim its protection? Second, does the Covenant apply to activities or operations that commenced after it was signed? Third, do the circumstances underlying Plaintiffs' claims constitute "normal usage"? The Court considers each question in turn.

**I.    The Covenant is Not Limited to Pacific Gas Transmission Co.'s Activities.**

Pacific Gas Transmission Company, now GTN, is the only entity named in the Restrictive Covenant. As such, Plaintiffs assert GTN is the only Defendant who can invoke the Covenant's protections. This interpretation runs counter to the Covenant's plain language which bars complaints concerning accepted resource management practices conducted in the nearby area "*including* the normal usage of Pacific Gas Transmission Co." Ellison Decl. Ex. B (emphasis added). Generally, the term "including" indicates a partial list that is illustrative of the preceding principle. Ariz. State. Bd. For Charter Sch. v. U.S. Dep't of Educ., 464 F.3d 1003, 1007 (9th Cir. 2006) ("In both legal and common usage, the word 'including' is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle."); McHenry v. PacificSource Health Plans, 679 F.Supp.2d 1226, 1242 (D. Or. 2010). Plaintiffs present no evidence to suggest the parties to the Restrictive Covenant intended to depart from this commonly understood meaning. Jeff D. v. Andrus, 899 F.2d 753, 760 (9th Cir. 1989) ("The overriding purpose in interpreting a contract is to give effect to the mutual intent of the parties at the time the contract was made."); Apeldyn Corp. v. Eidos, LLC, 943 F.Supp.2d 1145, 1148 (D. Or. 2013) ("Under Oregon law, the objective in contract interpretation is to give effect to the parties' agreed-upon intentions."). Thus, the Covenant's reference to GTN's usage does not limit its scope exclusively to GTN. Rather, it serves as an example of the protected activities contemplated by the Covenant. The phrase "accepted resource management practices" encompasses gas facility operations like those undertaken by GTN. Because there is no dispute that the other Defendants' operations are similar to — and, in fact, interconnected with — GTN's operations, the Covenant may shield all Defendants from suit.

On a related note, Plaintiffs interpret "accepted resource management practices" to refer to farm uses only. Thus, in order to invoke the Covenant's protections, Plaintiffs assert

Defendants must either claim some relation to GTN or show they are engaged in an agricultural, not industrial, use. This either-or interpretation impermissibly reads the term "including" straight out of the Covenant. Apeldyn Corp., 943 F.Supp.2d at 1149 (quoting Williams v. RJ Reynolds Tobacco Co., 351 Or. 368 (2011)) ("[t]he court must, if possible, construe the contract so as to give effect to all of its provisions"). The Covenant explicitly states that "accepted resource management practices" *include* uses like GTN's normal operations, not that the two are separate alternatives. The County and State documents Plaintiffs cite to support their interpretation cannot invalidate the Covenant's clear terms. Bjugan v. State Farm Fire & Cas. Co., 969 F.Supp.2d 1283, 1287 (D. Or. 2013) (citing Allstate Ins. Co. v. State Farm Mutual Auto. Ins. Co., 67 Or.App. 623, 627 (1984)) (unambiguous contract language is controlling).

## II.   The Restrictive Covenant Explicitly Contemplates Application to Future Activities.

The gas facility did not odorize gas at the time Plaintiffs signed the Restrictive Covenant. Ellison Decl. Ex. B; Toews Decl. ¶ 9. Its first odorizer was installed in 1995, about two years after the Covenant was signed and one year before Plaintiffs moved into their newly built home. Ellison Decl. Ex. E, at 2-3. However, this time differential is of no relevance. The Covenant clearly envisions its application to future, evolving uses. Two terms make the Covenant's prospective scope clear. First, the Covenant bars permit grantees and *successors in interest* from filing suit. Second, it prohibits claims regarding activities that *may* occur on nearby lands. Plaintiffs present no evidence to suggest the parties to the Restrictive Covenant intended to depart from the plain meaning of these terms. Jeff D., 899 F.2d at 760; Apeldyn Corp., 943 F.Supp.2d at 1148. Just the opposite, Plaintiffs concede that GTN/Transcanada is entitled to operate an odorizer at the facility. Supplemental Ellison Decl. Ex. C, at 14 (N. Fernlund Dep.

99:4-13). Accordingly, there is no dispute that the Restrictive Covenant's scope extends beyond activities in process at the time it was signed.

### III.   There is No Evidence Defendants' Operations Were Abnormal.

Because the Restrictive Covenant covers Defendants' normal usage on nearby lands, Plaintiffs' claims are barred unless they can demonstrate Defendants activities were abnormal. Plaintiffs fail to do so.

There is no dispute that the operation and maintenance of odorization systems is common at gas transmission facilities. Faulkenberry Decl. ¶ 8; Supplemental Ellison Decl. Ex. C, at 14 (N. Fernlund Dep. 99:4-13). Nor is there any dispute that it is normal for such a facility to periodically emit detectable odors. Lisagor Decl. Ex. 4B, at 10 (N. Fernlund Dep. 187:12-16); Toews Decl. ¶ 14; Anderson Decl. ¶6. For instance, the facility may emit odors when an odorizer is replaced or repaired, an odorant tank is filled, a valve manually or automatically vents, odor molecules escape through equipment fittings, odorant leaks, or odorized gas leaks. Webb Decl. Ex. H, at 13 (O'Neill Dep. 75:11-22); Webb Decl. Ex. J, at 10 (Webb Dep. 32:21-23); Ellison Reply Decl. Ex. C, at 9 (O'Donnell Dep. 40:3-41:11); Ellison Reply Decl. Ex. G, at 10 (McNulty Dep. 37:4-8).

Plaintiffs have not presented any evidence to suggest that Defendants' operations fall outside of these accepted practices. The record reveals that Plaintiffs smell odors emanating from the facility frequently. Each time Plaintiffs report an odor, Defendants dispatch a worker to investigate. Most of the time, the workers find nothing of concern. However, on three occasions, the workers identified leaks thanks to Plaintiff's complaints. Plaintiffs released Defendants from liability for the first of these leaks. Supplemental Ellison Decl. Ex. A, at 4. The other two were minor and promptly repaired. Webb Decl. Ex. A, at 10-11; Webb Decl. Ex. C, at 4-7; Lisagor

Decl. Ex. 4, at 12-13 (N. Fernlund Dep. 159:8-160:15); Ramfjord Decl. Ex. 4, at 4-5 (Daniels Dep. 84:24-85:2). Plaintiffs themselves concede that it is normal for a gas facility to occasionally require repairs. Ramfjord Decl. Ex. 2, at 8 (N. Fernlund Dep. 187:12-22). They present nothing to suggest that these minor leaks or Defendants' treatment thereof was out of the ordinary. Nor is there any evidence to suggest the facility was not operating normally during the numerous instances in which Plaintiffs detected a smell and Defendants found no related leak. Because the circumstances underlying Plaintiffs' claims involve Defendants' normal operations, the Restrictive Covenant bars Plaintiffs' suit. Accordingly, there is no genuine dispute as to Defendants' liability and Defendants motions for summary judgment should be granted.

## RECOMMENDATION

For the aforementioned reasons, Defendants' motions (#64, #77, #91) should be GRANTED and Plaintiffs' request for judicial notice (#79) should be DENIED.

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. See FED. R. CIV. P. 72, 6.

Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED this 3 day of October 2014.

MARK D. CLARKE
United States Magistrate Judge

Page 18 – Report and Recommendation